**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BRITHRIC ENTERPRISES, LLC, et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>BAY EQUITY LLC, )<br>)<br>Defendant. ) | No. 20-cv-04696<br><br>Judge Andrea R. Wood |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Brithric Enterprises, LLC and Brithric Enterprises Realty, LLC, doing business as BE Realty (together, "Brithric"), use their **be** mark in connection with their residential real estate brokerage services. Defendant Bay Equity LLC ("Bay Equity") offers mortgage brokerage services and recently started using its registered **be** and **be** marks, which Brithric contends infringe on its common law trademark. Brithric has brought this lawsuit for unfair competition pursuant to the Lanham Act, 15 U.S.C. § 1051 *et seq.*, Uniform Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/1 *et seq.*, Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.*, and Illinois unfair competition laws. Now before the Court is Brithric's motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a). (Dkt. No. 12.) Brithric seeks to enjoin Bay Equity's continued use of the mark in connection with its mortgage brokerage business. For the reasons detailed below, Brithric's motion is denied.

**BACKGROUND**

Brithric Enterprises, LLC and Brithric Enterprises Realty, LLC are both Illinois limited liability companies with their principal places of business in Chicago, Illinois. (Compl. ¶¶ 5–6,

Dkt. No. 1.) Brithric began offering residential real estate brokerage services in 2012. (Decl. of Ian Carswell ("Carswell Decl.") ¶ 10, Dkt. No. 44.) In May 2012, Brithric started using its

**be realty** ("be realty") mark, and in May 2014, it started using the **be** ("be") mark. (*Id.* ¶¶ 4–5.) Brithric decided to register the "be realty" mark with the U.S. Patent and Trademark Office ("USPTO") in early 2019. When Brithric still had not heard back regarding its trademark application in May 2020, it did some research and discovered that Bay Equity had trademarked several "be" marks already. Brithric filed this case on August 10, 2020 and moved for a preliminary injunction shortly thereafter.

Bay Equity was founded in California in 2007 and remains a California limited liability company with its principle place of business there. (Compl. ¶ 7; Def.'s Mem. in Opp'n, Ex. A, Decl. of Autumn Van Rooy ("Van Rooy Decl.") ¶ 2, Dkt. No. 38.) Bay Equity provides direct-to-consumer mortgage lending and refinancing services. (Van Rooy Decl. ¶ 2.) It is licensed and registered to do business in 42 states and has been doing business in Illinois since 2015. (*Id.* ¶¶ 3–4.) Bay Equity has three offices in Illinois—in Plainfield, Berwyn, and Grayslake. (*Id.* ¶ 6.) Bay Equity has been using its "BE ALL IN!" mark since 2012 and started to transition to its **be** ®

and **be** ® ("be") marks in December 2018. (*Id.* ¶¶ 10, 17, 22.) Bay Equity applied for trademarks with the USPTO for its two "be" marks on July 26, 2018 and received the trademarks in April and October 2020. (*Id.* ¶ 9.)

The Court allowed the parties to conduct expedited discovery concerning Brithric's preliminary injunction motion and held an evidentiary hearing on February 5, 2021. (*See* Dkt. No. 64.) Brithric and Bay Equity each presented one witness. Ian Carswell testified on behalf of Brithric. Carswell is a member and co-owner of both Brithric limited liability companies.

(Carswell Decl. ¶ 2.) Autumn Van Rooy, who is Bay Equity's Executive Vice President of Branch Finance and Onboarding, testified on behalf of Bay Equity. (Van Rooy Decl. ¶ 1.) Having considered the evidence and arguments of the parties, the Court finds that a preliminary injunction is not warranted.

## DISCUSSION

"An equitable, interlocutory form of relief, a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Valencia v. City of Springfield*, 883 F.3d 959, 965 (7th Cir. 2018) (internal quotation marks omitted). "It is never awarded as a matter of right." *Id.* (quotation marks omitted). When faced with a motion for preliminary injunction, the court conducts an analysis with two phases: "a threshold phase and balancing phase." *Id.* (quotation marks omitted). At the threshold phase, the party seeking the preliminary injunction must make three showings: "(1) absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to the final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) its claim has some likelihood of succeeding on the merits." *Id.* (internal quotation marks omitted). If all three requirements are met, the Court then moves to the balancing phase, in which it "weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Id.* at 966 (quotation marks omitted). This is also called the "sliding scale" approach: "the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020), *petition for cert. filed sub nom. Dart v. Mays* (U.S. Jan. 26, 2021) (No. 20-990). Finally, the Court considers the public

interest in denying or granting the injunction. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

## I.      Likelihood of Success on the Merits

The Court turns first to the question of Brithric's likelihood of success on the merits. The Seventh Circuit has recently clarified that to obtain a preliminary injunction, the plaintiff must make a "strong showing" that it is likely to succeed on the merits. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)), *petition for cert. filed* (U.S. Feb. 8, 2021) (No. 20-cv-1081).[1] While this is a significant burden, the plaintiff "need not show that it will definitely win the case" or even show that the preponderance of the evidence favors its success. *Id.* at 763. A "strong" showing "normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.*

Brithric's Complaint requests injunctive relief pursuant to the Lanham Act, the UDTPA, and the ICFA. The Lanham Act provides in relevant part that a plaintiff may bring a civil action against

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin . . . which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activity by another person.

15 U.S.C. § 1125(a)(1). To succeed on its federal trademark infringement claim, Brithric must establish (1) that its "be" mark is protectable, (2) that Bay Equity used the mark in commerce, and (3) that Bay Equity's use of the term is likely to cause confusion. *Ty*, 237 F.3d at 897. Because the

---

[1] In *Illinois Republican Party*, the Seventh Circuit officially repudiated that the "better than negligible" standard often cited by plaintiffs seeking preliminary injunctions. 973 F.3d at 762–63.

parties do not dispute that Bay Equity uses the mark in commerce, the Court's analysis focuses the legitimacy of Brithric's common law trademark and the likelihood of confusion.

The elements required to prove a UDTPA cause of action overlap with the elements of a Lanham Act claim: (1) that the petitioning party has a protectable trademark; and (2) that the defendant's use of the trademark is likely to cause confusion. *Holbrook MFG LLC v. Rhyno Mfg. Inc.*, No. 20-cv-05940, 2020 WL 6343083, at *7 (N.D. Ill. Oct. 29, 2020). The elements of an ICFA claim "are the same as those under the Lanham Act with the added element that the tortfeasor intend that consumers rely on the deception." *Coach, Inc. v. Di Da Imp. & Exp., Inc.*, No. 13 C 7165, 2015 WL 832410, at *4 (N.D. Ill. Feb. 25, 2015) (quotation marks omitted). The Court thus focuses its analysis on the elements of Brithric's Lanham Act claim.

### A.     Whether Brithric's Mark is Protectable

A plaintiff may show that its mark is protectable in several ways. First, it may prove that it registered the mark with the USPTO Principal Register, as "[r]egistration of a mark in the Principal Register is prima facie evidence of the validity of the registered mark." 15 U.S.C. § 1057(b). When the plaintiff's mark is unregistered (as is the case here), the plaintiff has the burden to establish that its mark as distinctive enough to warrant protection under the Lanham Act and that it has proper ownership of the mark. *Johnny Blastoff, Inc. v. L.A. Rams Football Co.*, 188 F.3d 427, 433 (7th Cir. 1999); *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 727 (7th Cir. 1998).

"Marks are often classified in categories of generally increasing distinctiveness; . . . they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). A generic term is one that is commonly used to name that particular product and is therefore not entitled to trademark protection. *See H-D Mich.,*

*Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 761 (7th Cir. 2007); *Platinum Home Mortg.*, 149 F.3d at 727. A descriptive mark "describes the ingredients, qualities, or characteristics of an article of trade or a service" and is generally not protectable but may be under certain circumstances. *Platinum Home Mortg.*, 149 F.3d at 727 (quotation marks omitted). The term "bubbly" as applied to champagne is an example of a descriptive term. *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1085 (7th Cir. 1988), *abrogated on other grounds by Ill. Republican Party*, 973 F.3d 760. A suggestive mark "stands for an idea which requires some operation of the imagination to connect it with the goods." *Platinum Home Mortg.*, 149 F.3d at 727. Arbitrary terms (*e.g.*, a phrase taken out of context, like "'Black & White' scotch"), *G. Heileman Brewing Co., Inc. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 992 (7th Cir. 1989), and fanciful terms (e.g., a coined term like "Kodak") are generally fully protected. *Int'l Kennel Club of Chi.*, 846 F.2d at 1085.

In classifying Brithric's "be" mark, the Seventh Circuit case *Sullivan v. CBS Corp.*, 385 F.3d 772 (7th Cir. 2004), is instructive. There, the plaintiff had a trademark in his band name "Survivor" and brought suit against the CBS television network for using the name on the logo for its television show "Survivor." *Id.* at 774. The court of appeals found that the district court had wrongly classified the plaintiff's mark as descriptive when it was, in fact, arbitrary. *Id.* at 776. As the Seventh Circuit explained:

> The word "survivor" when used as a band name is arbitrary; there is nothing about the word which is necessary to the description of a band, or of Sullivan's band. Because the word "survivor" is a common word that is being applied to a service unrelated to its meaning, the [b]and name, properly considered, is an arbitrary mark.

*Id.* Similarly, here, Brithric's has adopted the common word "be" for its company BE Realty. There is nothing about the term "be" that is related to or describes residential realty services. The Court thus finds that the mark at issue here is properly classified as arbitrary.

The classification of Brithric's mark as arbitrary does not automatically guarantee it strong protection. *Id.* "[I]f it is used only in a narrow area, others may use a similar mark for different goods without any trademark infringement." *Id.* Thus, the Court may assume that Brithric is entitled to strong protection with respect to other residential realty companies, but there is no presumption that its mark is equally strong outside that area.

In addition to distinctiveness, a trademark is only protectable if the owner shows that it has adopted and used the mark in connection with its product in the marketplace. *Johnny Blastoff*, 188 F.3d at 433; *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80 F. Supp. 2d 815, 878–79 (N.D. Ill. 1999) ("[t]rademark rights are acquired by adoption and use, not by registration" (quotation marks omitted)). Common law confers superior ownership rights on "[t]he party who first appropriates the mark through use." *Johnny Blastoff*, 188 F.3d at 434; *see also Planet Hollywood*, 80 F. Supp. 2d at 879. "'Use' under the common law means that the mark was attached to the product or service sold to the public." *Planet Hollywood*, 80 F. Supp. 2d at 879. Such use must also be continuous. *Id.* In this case, Brithric has presented evidence that it has been using the "be" mark since 2014—on its office awnings and signage, on marketing materials, coffee mugs, and sponsorship materials. (Carswell Decl. ¶ 5; *see id.* Ex. D, Dkt. No. 44-4.) It has also used the mark in its email communications with clients and on its social media pages. (*See* Pl.'s Hr'g Exs. at BEREALTY000004, BEREALTY000008–09.) Bay Equity has only been using its "be" mark since December 2018. (*See* Van Rooy Decl. ¶ 17.) Since the Seventh Circuit has

made clear that prior use in the marketplace, not registration, confers ownership, the Court finds that Brithric has demonstrated an ownership right over the "be" mark.

In conclusion, the Court finds that Brithric has acquired a protectable right in its "be" mark. As Bay Equity has conceded that it uses the "be" mark in commerce, the Court turns to the third part of the Lanham Act analysis: whether there is a likelihood of confusion between Brithric's and Bay Equity's marks.

## B. Likelihood of Confusion

Likelihood of confusion is a "factual determination" based on an "equitable balancing test." *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000). Courts generally examine seven factors:

> (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the complainant's mark; (6) actual confusion; and (7) intent of defendant to palm off his product as that of another.

*Id.* at 1043–44 (internal quotation marks omitted). No single factor is dispositive, and this Court may assign varying weights to each of the factors, but three factors are considered "particularly important: the similarity of the marks, the defendant's intent, and actual confusion." *Id.* at 1044.

### 1. Similarity of the Marks

In determining whether two parties' marks are similar, the Court examines the marks as a whole, not by looking at their separate elements. *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929–30 (7th Cir. 2008). The important question is ***not*** whether the public would confuse the marks themselves, but whether it is likely that the public would believe that the marks derive from the same source. *Id.* at 930.

The images below show Brithric's use of its "be" trademark (lime green and white), followed by Bay Equity's (black and white).

8



(*Compare* Pl.'s Hr'g Exs. at BEREALTY000141, *with* Van Rooy Decl., Ex. 2, Dkt. No. 38.)

Brithric has presented images of its mark with white lettering on a lime green background and

vice versa. (*See* Carswell Decl., Ex. D at 5–6.) Most of Brithric's images display the "be" on a

square background, but it has shown the "be" mark on a circular background on social media

posts. (Pl.'s Hr'g Ex. 9, Side-by-Side Social Media Posts ("Side-by-Side").) Bay Equity uses a

greater variety of colors to display its "be" mark, primarily oranges and blues. Bay Equity has

presented images of its marks in black and white; black and orange; and navy and white. (*See* Van

Rooy Decl., Exs. 4, 11, Dkt. No. 38.) Van Rooy testified at the hearing that Bay Equity has never

used green.

      The most striking similarities between Brithric's and Bay Equity's marks are the use of the

term "be," all in lowercase letters, on solid color backgrounds. Similar uses of font and color may

indicate a similarity. *See Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 426 (7th Cir. 2019).

There are differences between Brithric's and Bay Equity's marks—as discussed above, Brithric

primarily uses a square shape while Bay Equity uses a circle; Brithric's "be" mark is not followed

by a period while Bay Equity's is; Brithric's font is thin while Bay Equity's is thick. But looking at the marks as a whole, the Court finds that they are similar enough that a consumer could readily believe they represent the same entity. The marks are not identical, but as a gestalt, they resemble each other. The lowercase lettering of the same word "be" and uses of solid background colors are especially distinctive. Even if Bay Equity has apparently never used Brithric's signature lime green coloring, that fact is less significant since Bay Equity uses a variety of other colors. If consumers have already seen Bay Equity's trademark in various colors, they may be more likely to attribute another color to Bay Equity, as well.

The Court concludes that the "similarity of the marks" factor weighs in favor of Brithric.

### 2.      Similarity of the Products

In determining the similarity of the products, the key inquiry is whether the products or services "are the kind the public attributes to a single source." *Ty*, 237 F.3d at 899 (quotation marks omitted); *see also Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990) (holding that trademark protection extends to "such other [products and services] as might naturally or reasonably be expected to come from [it]" (quotation marks omitted)).

Bay Equity emphasizes that it and Brithric are not direct competitors. Brithric provides real estate brokerage services to individuals buying homes. Bay Equity is a mortgage brokerage firm, which offers financing to home buyers. Brithric does not provide mortgage brokerage services. In other words, an individual could conceivably buy one home using both Brithric's real estate services and Bay Equity's financing services. The companies do not directly compete for clients. Nonetheless, both companies offer services specifically to residential home buyers. As to the question of whether a typical consumer could attribute their services to the same source, Brithric and Bay Equity disagree about how common it is for one brand to offer both real estate

10

and mortgage brokerage services. Carswell testified that integration between the two sectors of the industry is "increasingly regular." Van Rooy described that integration as "more than an anomaly." But both witnesses acknowledged that there are firms which provide both services. Further, the home buying and home financing processes are necessarily interconnected. Carswell testified that Brithric has relationships with mortgage brokers and that they regularly refer clients to each other. Given the overlap in services, it would be reasonable for a consumer who saw similar trademarks to believe that a real estate brokerage firm and mortgage brokerage firm were related.

The Court concludes that the similarity of the products factor weighs in Brithric's favor, though not as strongly as it would if Brithric and Bay Equity were direct competitors.

### 3.        Area and Manner of Concurrent Use

When considering the two marks' areas and manners of concurrent use, the Court must assess "whether there is a relationship in use, promotion, distribution, or sales between the goods and services of the parties." *Ty*, 237 F.3d at 900 (internal quotation marks omitted). "When the goods and services are in close competition, marks need not be as similar in order to find infringement." *Lettuce Entertain You Enters., Inc. v. Leila Sophia AR, LLC*, 703 F. Supp. 2d 777, 786–87 (N.D. Ill. 2010). The relevant factors as to the area and manner of concurrent use include: (1) the parties' geographical distribution areas, (2) whether there is any evidence that the products directly compete, and (3) whether the products are marketed in similar channels. *Ty*, 237 F.3d at 900.

First, with respect to the parties' geographic areas, Brithric has offered evidence purporting to show that it has a nationally recognized brand. For instance, it offered a chart showing its clients' primary states of residence. (*See* Carswell Decl., Ex. A, Owner Directory,

Dkt. No. 45.) Some of those individuals reside in Illinois, while others live in New York, California, Minnesota, New Jersey, Ohio, and various other states. (*Id.*) However, the properties those clients own are all located in Illinois, and the majority of those are in Chicago. (*Id.*) Brithric also submitted a chart of its followers on the social media website Instagram. (Carswell Decl., Ex. B, Dkt. No. 46.) Of 220 followers, nearly two-thirds are located in Illinois. (*Id.*) The area with the next highest number of followers is California, where eleven of Brithric's followers are located. (*Id.*) The remaining are spread across various states and even outside the United States. (*Id.*) Brithric's website analytics demonstrate that its site attracts visitors from various locations across the country, but around 39% of its new users are located in Chicago. (*See* Carswell Decl. Ex. C, Dkt. No. 47.) Carswell testified that Brithric is based in Illinois and primarily operates out of Chicago. It holds a real estate license only in Illinois and assists with the purchase and sale of properties located in Illinois. It markets itself to people in Illinois or who are considering moving into the state.

Overall, Brithric's website visitors and social media followers show that while it might have a small national following, most of its potential clients are located in Illinois. And even more relevantly, Brithric has not presented any evidence that it assists with real estate transactions taking place outside the State of Illinois. The Court concludes that Brithric's primary geographic area is Illinois and, more specifically, the Chicago area.

Bay Equity offers its services in 42 states, including Illinois. (Van Rooy Decl. ¶ 3.) Within Illinois, it has offices in Berwyn, Grayslake, and Plainfield. (*Id.* ¶ 6.) The Court does not have as much detailed information concerning where Bay Equity's offers its services in Illinois. Brithric suggests such information is not relevant here. But Brithric does not cite any legal authority for that claim, and this Court disagrees. The area and manner of use is one of the seven factors

relevant to the likelihood of confusion. Without more detailed information, the Court concludes based on Bay Equity's office locations that it primarily serves its Illinois clients outside of Chicago. Brithric is based in Chicago and seems to assist customers buying homes mostly within the city. (*See* Owner Directory.) The Court therefore concludes that there is minimal overlap in Brithric's and Bay Equity's geographic areas.

The second question that is relevant to the area and manner of use factor is whether Brithric and Bay Equity are direct competitors. As discussed above, the two companies offer distinct (albeit related) services. They do not directly compete.

Third, the Court analyzes whether Brithric and Bay Equity market their services in similar channels. Carswell testified that Brithric's primary manner of attracting clients is on websites like Facebook and Yelp. Brithric also utilizes business listing syndication services to ensure that its company name and logo is listed on as many websites as possible. Van Rooy did not testify as to the type of marketing Bay Equity relies upon most heavily, either nationally or within Illinois. However, his testimony mentioned marketing and advertising channels like social media, video and print advertisements, and building signage. There is no evidence before the Court to suggest that Brithric and Bay Equity rely heavily upon the same channels to market their services.

To conclude, the Court finds that the evidence does not demonstrate that Brithric and Bay Equity operate concurrently in the same area or manner. This factor favors Bay Equity.

### 4. Degree of Care Likely to be Exercised by Consumers

Generally, when the cost of a party's services are high, "'courts assume that purchasers are likely to be more discriminating than they might otherwise be.'" *MB Fin. Bank, N.A. v. MB Real Est. Servs., L.L.C.*, No. 02 C 5925, 2003 WL 21462501, at \*16 (N.D. Ill. June 23, 2003) (quoting *Maxim's Ltd. v. Badonsky*, 772 F.2d 388, 393 (7th Cir. 1985)). "Where consumers are

sophisticated, deliberate buyers, confusion is less likely than where the consumers are prone to make uninformed, impulse purchases." *Planet Hollywood*, 80 F. Supp. 2d at 882. By contrast, "[t]he more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *CAE Inc. v. Clean Air Eng'g., Inc.*, 267 F.3d 660, 683 (7th Cir. 2001).

Bay Equity has offered several cases from outside this Circuit to support its assertion that consumers of real estate brokerage and mortgage brokerage services are highly sophisticated and discerning. *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Fam. Music Ctr.*, 109 F.3d 275, 285 (6th Cir. 1997) (noting as an example in a case concerning the sale of musical instruments that "home buyers will display a high degree of care when selecting their real estate brokers"); *Comerica Inc. v. Fifth Third Bankcorp*, 282 F. Supp. 2d 557, 571 (E.D. Mich. 2003) (finding that "customers exercise a high degree of care in choosing banking services because acquiring a home equity line of credit is a major transaction"); *Golden W. Fin. v. WMA Mortg. Servs.*, No. C 02-05727 CRB, 2003 WL 1343019, at *5 (N.D. Cal. Mar. 13, 2003) (finding that "mortgage consumers exercise a high degree of care in their purchasing decisions since buying a home is one of the most significant transactions people will make in their lifetimes"). This Court agrees. A residential property is likely to be the most expensive and significant purchase that the typical consumer will ever make. Admittedly, the property itself is probably of greater consequence to the consumer than the brokerage services they employ to buy it. But overall, home buyers are likely to be sophisticated consumers who exercise a great deal of care in selecting their brokers.

The Court finds that the degree of care factor weighs strongly in Bay Equity's favor.

### 5.      Strength of Brithric's Mark

"The stronger the mark, the more likely it is that encroachment on it will produce confusion." *AutoZone*, 543 F.3d at 933 (internal quotation marks omitted). Courts analyze the strength of a party's mark by evaluating its overall "economic and marketing strength." *Id.* Economic and marketing strength depends on the "distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular source." *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 464 (7th Cir. 2000) (quotation marks and alterations omitted). The only ways to directly prove the public's evaluation of a mark are through customer testimony and consumer surveys. *Gimix Inc. v. JS & A Grp., Inc.*, 699 F.2d 901, 907 (7th Cir. 1983). But the Court may also consider evidence of the frequency of the mark's display and the quantity of advertising dollars used to promote the mark. *See AutoZone*, 543 F.3d at 933 (holding that the evidence that the plaintiff had spent millions of dollars' on advertising to promote its mark and that the mark was displayed prominently on thousands of stores nationally was more than sufficient to establish the mark's strength). In addition, a party may show the strength of its mark through long-term, continuous use and good reputation. *See Barbecue Marx*, 235 F.3d at 1045.

Brithric has not offered any direct evidence of the strength of its "be" mark. However, as the Court concluded above, Brithric's mark is sufficiently distinctive to be protectable. Brithric has also been using the mark for more than six years, which establishes its long-term use. *See id.* (holding that the plaintiff's use of the same mark for six years was one factor indicating the mark's strength). In terms of advertising dollars, the Court must consider Brithric's spending in proportion to its size. For smaller businesses, it is helpful to compare the amount of money the plaintiff spends on advertising, particularly "brand awareness marketing," to its total revenues.

*See LHO Chi. River, L.L.C. v. Rosemoor Suites, L.L.C.*, 16 C 6863, 2017 WL 467687, at \*10
(N.D. Ill. Feb. 3, 2017). In *LHO Chicago River*, the district court found that the plaintiff did not
spend a significant amount of money advertising its mark because it spent less than 1% of its total
revenues marketing its brand. *Id.* By contrast, in *International Kennel Club of Chicago*, the
Seventh Circuit considered the plaintiff's mark strong where it had spent more than 25% of its
total revenues on advertising and public relations expenses, and frequently received free
advertising on top of that. 846 F.2d at 1086. Here, Brithric has presented evidence that over a
recent five-year period, it spent a total of $104,703 on marketing, and that over the same period,
its total gross income (less rents) was $3,544,543. (*See* Reply, Ex. 8, Be Realty Revenue, Dkt. No.
43.) (Because the Court lacks information concerning Brithric's total revenues and how much of
its marketing budget went directly to its "be" mark, the Court relies on these data points as a
rough substitute.) Brithric's marketing expenditure thus constituted around 3% of its gross
income. Those advertising dollars would constitute an even lower percentage of Brithric's total
revenues.

The Court concludes that Brithric has failed to establish the strength of its mark. Consumer
surveys and testimony are not necessary to demonstrate trademark strength. But absent such
evidence, the plaintiff must present other, indirect evidence of the mark's strength, like a high
frequency of display, high advertising spending, or good reviews and goodwill surrounding the
mark. Brithric has offered several examples of how it uses its "be" mark and has demonstrated
that it contributes a small amount of its income to advertising. These facts are not sufficient to
establish the mark's strength. The Court therefore finds that this factor weighs in Bay Equity's
favor.

### 6. Actual Confusion

Evidence of actual confusion is not required to prove that a likelihood of confusion exists. *CAE*, 267 F.3d at 685. But evidence of actual confusion is considered particularly important to the Court's analysis. *Barbecue Marx*, 235 F.3d at 1044. In determining whether a plaintiff has established the presence of this factor in the analysis, the Court must see "evidence of ***actual*** confusion, not a mere risk of confusion." *Eli Lilly & Co.*, 233 F.3d at 465.

Brithric has conceded that it does not have any evidence of actual confusion between its mark. (*See* Reply at 7–8.) At the preliminary injunction hearing, Carswell could not provide a specific example of any instance of confusion. The Court thus finds that the actual confusion factor weighs strongly in Bay Equity's favor.

### 7. Intent of Bay Equity

The seventh and final factor in the likelihood of confusion analysis is the defendant's intent to palm off its product as that of another. *Barbecue Marx*, 235 F.3d at 1046. The Seventh Circuit has explained that palming or passing off is a type of fraud in which the defendant "tr[ies] to get sales from a competitor by making consumers think that they are dealing with that competitor, when actually they are buying from the passer off." *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 940 (7th Cir. 1986). Generally, to establish this factor, the plaintiff must present some evidence that the defendant acted in bad faith. *Packman v. Chi. Trib. Co.*, 267 F.3d 628, 644–45 (7th Cir. 2001). "Distinctive appearances and a clearly stated designation of origin weigh against finding an intent to palm off." *Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 863 (N.D. Ill. 2018) (internal quotation marks omitted).

Brithric argues that it has proven Bay Equity's bad faith and bad intent by offering side-by-side comparisons of several of its Instagram posts next to Bay Equity's similar posts, published

after Brithric's. (*See* Side-by-Side.) For instance, on August 4, 2020, Brithric posted a photograph

of a mother and young daughter drawing, with its "be" mark in the top left corner and text that

read "Are your needs in a home changing?" (*Id.* at 3.) On September 23, 2020, Bay Equity posted

a photograph of a mother holding a basket and moving box (her family in the background behind

her), with its "be" mark also in the top left corner and text reading "Ready for a change? How

about a new home for fall?" (*Id.*) Brithric posted a photograph of colorful paint brushes on March

31, 2020, and nearly one month later, Bay Equity posted a photograph of open paint cans of

various colors. (*Id.* at 1.) In December 2019, Brithric posted several holiday images with text that

showed its "be" mark followed by the words "home for the holidays." (*Id.* at 2.) Several weeks

later, on December 27, Bay Equity posted a photo of a mother and daughter with its "be" logo in

the top left corner, and text in the top right corner that read "Home for the Holidays the best gift of

all." (*Id.* (edited the capital letters).)

There are certainly similarities between these posts. But the Court does not consider this

sufficient evidence to establish that Bay Equity is intending to palm its product off as Brithric's.

First, the timing of Bay Equity's posts are not as close or suspicious as Brithric suggests. Bay

Equity posted its photograph of a mother and daughter nearly two months after Brithric. The

"home for the holidays" posts were closer in time, but as Bay Equity pointed out at the hearing,

one would expect to see such posts on social media around December. One might also expect to

see posts concerning home projects around March and April 2020, at the start of the COVID-19

pandemic, when so many people were stuck at home. Moreover, even if Bay Equity were blatantly

copying Brithric's social media messaging, there is no evidence that Bay Equity was trying to

confuse consumers or pass its products off as Brithric's. Its social media posts necessarily have a

"clearly stated designation of origin," *see Uncommon*, 305 F. Supp. 3d at 863, since its Instagram account name, visible next to all of its posts, is "bayequity." (*See* Side-by-Side.)[2]

There is no compelling evidence that Bay Equity is acting in bad faith by using the "be" mark or intending to palm off its services as Brithric's. The Court therefore concludes that this factor weighs in Bay Equity's favor.

### C.    Summary of Brithric's Likelihood of Success on the Merits

In summary, Brithric has presented evidence that it has a protectable ownership interest in the "be" mark. But with respect to the likelihood of confusion, the only two factors that weigh in Brithric's favor are the similarity between the marks and the similarity of the products. And those two factors do not weigh heavily in Brithric's favor. The factors of area and manner of concurrent use, degree of consumer care, strength of Brithric's mark, actual confusion, and intent to palm off all weigh in Bay Equity's favor. Of the factors that are considered particularly important, only the similarity of the marks weighs in Brithric's favor, while the actual confusion and intent to palm off weigh in Bay Equity's. The Court concludes that Brithric has not demonstrated a likelihood of confusion in this case. Given this result, Brithric has fallen short of making a strong showing that it is likely to succeed on the merits of its Lanham Act claim and its related Illinois state-law claims. This finding warrants denial of Brithric's motion for a preliminary injunction. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992).

### II.    Inadequate Remedy at Law and Irreparable Harm

Although Brithric has failed to meet its burden of showing that it is likely to succeed on the merits, the Court nonetheless considers whether Brithric has met the remaining requirements

---

[2] Brithric presented evidence that one of Bay Equity's brokers—under the account name "mortgageswithhustleandheart"—posted the image of paint cans with a blue "be" logo in the bottom left corner. (*See* Side-by-Side at 1.) It does not appear that the broker tagged Bay Equity. But without additional evidence that Bay Equity's brokers solicit business over social media using the "be" mark, that post is not enough to suggest that Bay Equity is attempting to palm off its services as Brithric's.

for a preliminary injunction: namely, a showing "that it has no adequate remedy at law and as a result, will suffer irreparable harm if the injunction is not issued." *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002). Irreparable harm is harm that is "not fully compensable or avoidable by the issuance of a final judgment (whether a damages judgment or a permanent injunction, or both) in the plaintiff's favor." *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013). "[I]f the harm can be fully repaired in the final judgment, there is no reason to hurry the adjudicative process." *Id.*

Following the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), the Seventh Circuit held that its prior presumption of irreparable harm no longer applies in patent and copyright cases. *See Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012). A subsequent Seventh Circuit case suggests that the presumption still applies in trademark cases due to the difficulty of quantifying the impact of consumer confusion on a brand's value. *See Kraft Foods*, 735 F.3d at 741. Yet district courts in this Circuit are divided on the issue. *Compare Mkt. Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, No. 14 C 4957, 2015 WL 3637740, at *23 n.20 (N.D. Ill. June 11, 2015) (collecting cases that apply the presumption), *with Ill. Tamale Co. v. El-Greg, Inc.*, No. 16 C 5387, 2019 WL 4395139, at *19–20 (N.D. Ill. Sept. 13, 2019) (declining to apply the presumption), *Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, No. 14 C 7424, 2015 WL 3633987, at *11 (N.D. Ill. June 10, 2015) (same). Given the Seventh Circuit's relatively recent reliance on the presumption and the fact that this matter is before the Court on a motion for a preliminary injunction, the Court will apply the presumption here. Accordingly, the Court presumes that because Brithric has asserted a claim for trademark infringement, any harm it suffers will be irreparable and it will not have an adequate remedy at law.

### III.    Balancing of Harms

For the sake of thoroughness, the Court also addresses the parties' evidence about the harms they would suffer as a result or in the absence of a preliminary injunction.

As noted above, when balancing the harms each party may suffer, the Seventh Circuit applies a sliding scale approach: "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Kraft Foods*, 735 F.3d at 740 (quotation marks omitted). The sliding scale approach "is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Ty*, 237 F.3d at 895–96 (internal quotation marks omitted). As previously explained, Brithric's likelihood of success on the merits is relatively slim, necessitating a stronger showing that the balance of harm weighs in its favor. Where the plaintiff has made a strong showing that the defendant's use of the mark poses a likelihood of confusion, the Court may assume that the loss of goodwill and control is substantial. *See Kraft*, 735 F.3d at 741. In this case, Brithric must present more concrete evidence of harm. But the only harms to which Carswell testified were abstract, such as loss of control and brand dilution. Brithric argues that if the preliminary injunction is not granted, it will have to undergo an expensive rebranding process or face the possible loss of its clients' goodwill. But Brithric has not offered any evidence that Bay Equity's use of its "be" trademark will negatively impact its goodwill. It has not suggested, for instance, that Bay Equity offers poor services that would reflect poorly upon Brithric.

By contrast, Van Rooy testified that if the preliminary injunction is granted, Bay Equity would have to shut down its business to remove all of the "be" marks from its websites, corporate

swag, and signage—steps he guessed would cost millions of dollars. While the Court is skeptical of Van Rooy's estimate,[3] it is clear that it would cost Bay Equity a significant amount of money to comply with an injunction ordering it to immediately stop using the "be" mark. Of course, the Court would not give the damage to Bay Equity as much weight if Brithric had presented a stronger case of trademark infringement. But given Brithric's showing as to its likelihood of success and its vague claims of harm, Van Rooy's testimony is more compelling.

Finally, the Court must consider the public interest in denying or granting the injunction. *Ty*, 237 F.3d at 895. Enforcement of trademark law serves the public interest by reducing consumer confusion. *See Eli Lilly & Co.*, 233 F.3d at 469. On the other hand, "trademark protection should not interfere with traditional policies of a competitive market." *Platinum Home Mortg.*, 149 F.3d at 726. The Court has already determined that there is a relatively low likelihood of confusion here. Thus, it is not in the best interest of the public to grant the preliminary injunction.

Based on the record, the balance of hardships weighs against Brithric and in favor of Bay Equity. The Court thus concludes that the extraordinary remedy of injunctive relief is not justified here.

---

[3] Van Rooy's testimony seemed to include the costs associated with shutting down Bay Equity's use of the "be" mark on a national level. As the Court determined above, Brithric operates only in Illinois. A preliminary injunction prohibiting Bay Equity's use of "be" mark throughout the entire country would not be appropriate even if Brithric had established a strong likelihood of success. The cost to Bay Equity of ceasing its use of the "be" mark within Illinois would likely be much less expensive than Van Rooy represented.

**CONCLUSION**

For the foregoing reasons, Brithric's motion for a preliminary injunction (Dkt. No. 12) is denied.

ENTERED:

Dated:  March 31, 2021

Andrea R. Wood
United States District Judge